IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Beanka Hassan,<br><br>                          Plaintiff,<br><br>vs.<br><br>North Dakota Department of Corrections and Rehabilitation,<br><br>                          Defendant. | Case No.: 1:19-cv-00011 |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

[¶ 1] THIS MATTER comes before this Court upon Defendant North Dakota Department of Corrections and Rehabilitation's ("Department") Motion for Summary Judgment filed on September 2, 2022. Doc. No. 48. The Plaintiff, Beanka Hassan ("Hassan") filed a Response on September 27, 2022. Doc. No. 53. The Department filed a Reply on October 11, 2022. Doc. No. 55. For the reasons set forth below, the Department's Motion for Summary Judgment is **GRANTED,** and the Complaint is **DISMISSED with prejudice**.

### BACKGROUND

[¶ 2] This is a case involving alleged sex and race discrimination. Hassan alleges she was subject to discrimination by the Department. Due to the nature of the claims, it is important to begin with the Department's hiring policy.

[¶ 3] From 2016 to 2017—the timeframe in which Hassan applied for positions with the Department—each job was advertised on the State's job website. Doc. No. 50-10, p. 72:12-13. Applications are only accepted through this online system. Id. at 72:18-21. Prior to posting a job,

-1-

a screening process is decided, which includes the minimum qualifications for each job posting. Id. at 72:21-73:1. Minimum qualifications are determined by the State's Office of Management and Budget, Human Resource Management Services and begin with a class description. Id. at 73:24-74:2. Each individual agency can make the minimum qualifications more restrictive, but not less restrictive. Id. at 74:7-9. For example, job postings will also include more-restrictive preferred qualifications, which may include such things as a bachelor's degree or certain years of experience. Id. at 73:2-4; 74:13-15; 81:1-3. When looking at years of experience, certain ranges of years of experience will earn the applicant more points on the weighted scale used by the Department. Id. at 81:2-11. When the Department is unable to interview each minimally qualified applicant, the Department looks to the preferred qualifications to determine which applications are scored highest. Id. at 73:5-9; 81:1-11. In other words, the minimum qualifications are a pass/fail review of the applications and the preferred qualifications receives a certain number of points on a fifty (50) point scale with the highest scores receiving interviews. Id. at 80:16-18.

[¶ 4]   The Department uses a screening tool that applies consistently to every applicant. Id. at 73:9-11. During the pre-employment time, the department determines interview questions and identifies the number of people to interview prior to receiving any applications. Id. at 73:14-20. When applications begin to come in, an HR officer screens the application materials to determine if they meet the minimum qualifications and have any preferred qualifications. Id. at 75:5-14. If the applicant does not meet the minimum qualifications, the application is not considered. Id. at 76: 6-9 ("[I]f an applicant did not meet minimum qualifications, we would stop at that stage and generally not score any preferred qualifications."). When reviewing the applications, the HR officer can also look at disqualifying information, such as an applicant with a criminal record. Id. at 82:14-83:10. If an applicant worked for the Department in the past, they would look to the prior

personnel file to review the applicant's performance history. Id. at 83:13-16. If the applicant interviewed for a position and it went poorly, the Department may choose not to interview that applicant or wait a few months before interviewing. Id. at 83:16-20.

[¶ 5]   Once the HR officer reviews each application and compiles a ranked list, the list is given to the hiring manager of the Department. Id. at 84:5-12. Once the interviewees are selected, the Department's hiring manager works with HR to select an interview panel and set up interviews. Id. at 86:8-14. Certain factors may change the interview pool size such as the need to hire more than originally posted or they received fewer applications than they determined to interview. Doc. Id. at p. 85:15-22. Human Resources always has the final review and approval. Id. at 86:17-19. During the interviews, each applicant is evaluated and scored by each interview panel member. Id. at 105:17-19. The same questions are asked of each applicant and applied consistently. Id. at 105:20-21. Each interviewer scores within the allotted range for each question based on their perception of how the interviewee answered. Id. at 21-25. Each interviewer will then add the scores from each question. Id. at 106:1-3. Because there are typically multiple interviewers, they would then come up with an average score of each interviewee. Id. at 106:3-7. Once scores are averaged, the applicants are then ranked and the list is provided to the hiring manager. Id. at 106:3-12. Additional criminal background check, personnel file review, reference check, or other preemployment screening tools may be reviewed again at this time. Id. at 106:22-107:6. Working with the HR officer, the hiring manager will then decide how many, if any, job offers to extend. Id. at 106:10-15.

[¶ 6]   Turning to the specific facts of this case, Hassan began working for the Department on September 1, 2015, as a Correctional Officer II at the North Dakota State Penitentiary ("NDSP"). Doc. No. 50-6, p. 2. During her time as a Correctional Officer, Hassan claims, "[w]hile I was

working there, I was put on the utility squad for - - since I started up until now where I would see, you could say, Caucasian females go into units and would be placed on the utility squad for two weeks at a time. Also, all pregnant females - - Caucasian females would be placed in more secured places, some away from inmates, like control rooms." Doc. No. 50-12, p. 84:7-14. Ultimately, she claims she was placed in the utility squad for a whole year when Caucasian females would be transferred to other units "after like a week or two." Id. at p. 88:3-7. Despite this allegedly unfair treatment, on June 29, 2016, Hassan submitted a letter of resignation of her position at NDSP to take a job as a dispatcher with the North Dakota State Radio, specifically noting she "enjoyed [her] position here tremendously." Doc. No. 50-1. Approximately one month later, Hassan began applying for numerous jobs with the various agencies within the Department.

[¶ 7]   On July 29, 2016, Hassan applied for a position as a Juvenile Institutional Residence Specialist I at the North Dakota Youth Correctional Center in Mandan, North Dakota—Job ID No. 3006473. Doc. No. 50-2. At a minimum, Hassan needed a bachelor's degree to qualify for this position. Id. at pp. 1-2. Hassan did not have a bachelor's degree at the time she applied. Doc. Nos. 50-2, p. 5 (Hassan's resume indicating she was still working on her associates of arts degree at the time of applying); 50-12, pp. 13-15 (noting Hassan received her associate of arts degree approximately one year prior to her deposition taken on February 4, 2022). The Department hired two applicants out of a pool of twenty-eight (28) applications, both of which were the highest scoring candidates. Doc. No. 50-11, p. 15. One of the hired applicants was "Caucasian/American Indian," and the other was "American Indian." Id. at p. 16.

[¶ 8]   On August 10, 2016, Hassan applied to be a Correctional Officer II at the Missouri River Correctional Center ("MRCC") in Bismarck—Job ID No. 3006543. Doc. No. 50-11, pp. 7, 24. Then-HR officer Shannon Davison was responsible for coordinating the hiring process. Id. at p. 7.

-4-

Due to Hassan's prior employment, Davison reached out to pervious supervisors regarding Hassan's application. Doc. No. 50-8, p. 67:7-68:19. Davison learned from Brian Jorgenson ("Jorgenson") that Hassan lacked motivation when she first worked as a Correctional Officer for the Department.[1] Id. at p. 68:20-69:6. Captain Justin Helgeson ("Helgeson") told Davison he recently ran into Hassan at a pizza restaurant in Bismarck and she smelled strongly of marijuana. Doc. No. 50-7, pp. 23:24-24:19; 27:7-28:12; 69:19-70:9. Davison trusted Helgeson's reported observation because he had specific training on determining if someone is under the influence for the Department's drug-free workplace. Doc. No. 50-8, pp. 77:17-78:10. Davison also contacted Hassan's current employer, the State Radio, who told Davison Hassan struggled with training. Id. at p. 70:22-71:4. This was important to Davison because the line of work was similar insofar as they both required responding to emergency situations, working in a control room, and using radios. Id. at p. 71:10-18. Ultimately, Davison decided not to interview Hassan for the position based on Helgeson's interaction with her at the pizza restaurant. Id. at 67:7-68:12. The Department ultimately hired four (4) out of seventy-two (72) applicants—three Caucasian males and one African American male. Doc. No. 50-11, p. 16.

[¶ 9]   On August 13, 2016, Hassan submitted another application for a position with the Department as a Correctional Officer II at the James River Correctional Center in Jamestown, North Dakota – Job ID No. 3006584. Id. at p. 8. Ultimately, she was not interviewed for this position because Davison passed along the information she learned during the application review for Job ID No. 3006543. Doc. Nos. 50-8, pp. 75:5-76:8; 50-11, p. 24. The Department hired four

---

[1] Although Jorgenson does not recall telling Davison that Hassan was not motivated, Jorgenson did recall having a conversation with Davison about Hassan and believed it was possible he said Hassan lacked motivation but would have to check his notes he kept prior to retiring. Doc. No. 50-9, p. 48: 2-25.

(4) out of twenty-three (23) applicants—one Caucasian female, one Caucasian male, one Black/African American male, and one Black/African American female. Doc. No. 50-11, pp. 16-17.

[¶ 10]   Hassan applied for a position as a Temporary Security Officer I at the North Dakota Youth Correctional Center ("YCC") on August 29, 2016 – Job ID No. 3006691. Doc. No. 50-3. She was offered an interview for this position, but canceled the interview and was not further considered for the job. Doc. Nos. 50-3, pp. 1-3; 50-11, p. 24.

[¶ 11]   On March 24, 2017, Hassan applied for a position at the MRCC as a Correctional Officer II – Job ID No. 3007927. Doc. No. 50-11, p. 9. She was not interviewed for this position because she was selected for another position with the Department. Id. at pp. 9, 24.

[¶ 12]   On March 25, 2017, Hassan applied for two positions with the Department. The first was at the NDSP as a Correctional Officer—Job ID No. 3007879. Id. at pp. 18, 25. The second was at the James River Correctional Center ("JRCC") as a Correctional Officer I – Job ID No. 3007661. Davison managed the hiring process for the first position at the NDSP and rejected Hassan's application on March 30, 2017, based upon the same information Davison learned during the process when Hassan applied to be a Correctional Officer II at the MRCC in Bismarck—Job ID No. 3006543—specifically, that Helgeson informed Davison that Hassan smelled strongly of marijuana at a pizza restaurant. Doc. Nos. 50-8, p. 76:9-77:21; 50-11, p. 25. HR Officer Sarah Martin managed the hiring process for the second position at JRCC and also rejected Hassan's application on August 2, 2017, for the same reasons as Davison. Doc. No. 50-11, p. 25. In addition, there were better qualified applicants for this position. Doc. No. 50-10, pp. 143:6 – 144:3. For the NDSP job, the Department hired twelve (12) of sixty-three (63) applicants for this position—one Asian male, one American Indian male, four Caucasian males, five Black/African American

males, and one Caucasian female. Doc. No. 50-11, pp. 18-19. For the JRCC job, the Department hired sixteen (16) out of ninety-one (91) applicants—one Hispanic female; one Hispanic male; eight Caucasian males, four Caucasian females, and two Black/African American males. Doc. No. 50-11, pp. 19-20.

[¶ 13]   On August 28, 2017, Hassan again applied to be a Correctional Officer I at JRCC—Job ID No. 3008610. Id. at pp. 21, 25. Hassan's application was rejected because she accepted a position as a Security Officer I at YCC—Job ID No. 3009222. Id. at p. 25; Doc. No. 50-4.

[¶ 14]   Hassan applied for the Security Officer I position at YCC on September 27, 2017. Doc. No. 50-4. Two days later, she filed a charge of discrimination with the North Dakota Department of Labor and Human Rights ("NDDOL") on September 29, 2017. Doc. No. 50-13, pp. 3-5. She alleged generally the Department did not hire her due to her race, color, and sex without providing specific details. Id. at p. 3. The claim was subsequently transferred to the United States Equal Employment Opportunity Commission ("EEOC"). Id. at p. 1. The Department submitted an initial response to the charge, which identified the jobs for which Hassan applied. Doc. No. 50-16, p. 2. The Department also identified the job for which Hassan was ultimately hired. Id. The EEOC only investigated the failure to hire for the timely applications in 2017 because the earlier jobs were time-barred. Doc. No. 50-5. On January 10, 2019, Hassan filed a complaint asserting one count of race discrimination and one count of sex discrimination, both un 42 U.S.C. § 2000e *et seq*. Doc. No. 1. Despite the allegations against the Department, Hassan remains employed with the Department, most recently as a Correctional Officer at the Adult Female Facility at Heart River Correctional Center in Mandan, North Dakota. Doc. No. 50-6, p. 2.

## SUMMARY JUDGMENT STANDARD

[¶ 15] Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-movant, indicates there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant. Id. "[W]e give the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (internal quotations omitted).

[¶ 16] The purpose of summary judgment is to determine whether the evidence presents sufficient disagreement as to warrant submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The movant bears the burden of informing the Court of the basis for its motion and must identify portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-movant may not rely on allegations or denials made in its pleading, rather its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1)(A). There is no genuine issue for trial and summary judgment is proper when the record, taken as a whole and viewed in the light most favorable to the non-movant, could not lead a rational trier of fact to find in favor of the non-movant. Diesel Mach., Inc., 418 F.3d at 832.

## DISCUSSION

[¶ 17] Hassan brings a claim for both racial and sex discrimination against the Department, contending they did not hire her because she is a black woman. In support of this contention,

Hassan relies solely on her observations while she worked for the Department from 2015-2016 in the "utility squad" at the North Dakota State Penitentiary. Doc. Nos. 53, pp. 24-26; 50-12, pp. 84:7-14, 88:3-7. Hassan argues her claims are timely, she has made an adequate showing of discrimination, and the reasons for not hiring her were a pretext for discrimination. The Department contends certain claims are time-barred; Hassan failed to make a *prima facie* showing of discrimination based on her race and sex; and there is no evidence their reason for not hiring Hassan was merely a pretext for race and sex discrimination. The Court does not need to consider whether certain claims were timely or whether Hassan has made a *prima facie* showing because the undisputed record is clear the reasons the Department did not hire her were not a pretext for discrimination.

[¶ 18]   Under Title VII, an employer cannot fail or refuse to hire any applicant "because of such individual's race, color . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff's claim may survive a defendant's motion for summary judgment in a case regarding unlawful discrimination in two ways. First, the plaintiff can provide "direct evidence" of discrimination. Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). "[D]irect evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." Id. If the plaintiff cannot provide direct evidence, the plaintiff must provide sufficient circumstantial evidence of illegal discrimination under the McDonell Douglas burden-shifting framework. Putman v. Unity Health Sys., 348 F.3d 732, 734 (8th Cir. 2003). "A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part McDonnell Douglas analysis to get to the jury." Griffith, 387 F.3d at 736.

[¶ 19] Here, there is no direct evidence of discrimination. Rather, the parties argue under the McDonnell Douglas framework. Under this analysis, the "plaintiff must first present a prima facie case of intentional discrimination. The burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. If defendant meets that minimal burden, plaintiff must show that the proffered nondiscriminatory reason is merely a pretext for unlawful ... discrimination." Putman, 348 F.3d at 735.

[¶ 20] To establish a *prima facie* claim in a failure to hire case, a plaintiff must show: "(1) she is in a protected class; (2) she was qualified for an open position; (3) she was denied that position; and (4) the [employer] filled the position with a person not in the same protected class." Torgerson, 643 F.3d at 1046. As for pretext, "[p]roof that the defendant's explanation is unworthy of credence [i.e., pretextual] is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Griffith, 387 F.3d at 736 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)). In St. Mary's Honor Center v. Hicks, the Supreme Court held, "[b]ut a reason cannot be proved to be 'a pretext *for discrimination*" unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." 509 U.S. 502, 515-16 (1993) (emphasis in original). Evidence that provides the reason was false but fails to show discrimination was the real reason is, therefore, insufficient to survive summary judgment. See id.

[¶ 21] Here, the Court does not need to consider whether Hassan has made a *prima facie* showing of discrimination because the record is clear the reason the Department did not hire Hassan was not a pretext for discrimination in any instance. Each occasion of not hiring Hassan was based on Helgeson's interaction with Hassan at the pizza restaurant, Hassan voluntarily withdrawing her application, Hasson being unqualified for the position, or because Hassan accepted a position with

the Department at YCC. While Hassan disputes Helgeson's account at the pizza restaurant, she does not offer any evidence Helgeson's interaction was false, he secretly had a discriminatory animus towards Hassan, or any other discriminatory motive against Hassan's application. See Murguia v. Childers, ___ F.4th___, 2023 WL 5441025, *4 (8th Cir. 2023) (explaining a plaintiff establishes pretext "by showing the "proffered explanation is unworthy of credence" "because it has no basis in fact" (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981), then quoting Torgerson, 643 F.3d at 1047).

[¶ 22] In addition, the Defendant relies on her experience while employed with the Department from 2015 to 2016 to claim pretext. However, she is unable to explain how that experience relates to her not getting hired in her subsequent applications. See Doc. No. 50-12, p. 153:21-154:2. In other words, her subjective formulations of the reason she was not hired are simply self-serving conclusions that do not support an inference of pretext in this case. See O'Bryan v. KTIV Television, 64 F.3d 1188, 1191 (8th Cir. 1995) (explaining, conclusory and self-serving statements, without more, do not establish pretext); see also Anuforo v. C.I.R., 614 F.3d 799, 807 (8th Cir. 2010) (noting, "self-serving allegations and denials are insufficient to create a genuine issue of material fact").

[¶ 23] Hassan's argument is weakened by her own testimony:

> Q. Okay. So, what information do you have that supports your belief that the Department considers sex and race in making its hiring decisions?
>
> A. How - - how I was treated.
>
> Q. How did - - go ahead.
>
> A. And what I experienced while - - I mean, what I experienced there between '15, '16.
>
> Q. Okay. And so - - but what you experienced, how does that relate to the hiring decisions made in each of these job postings?

> A. Specifically NDSP and Currently TYY, but mainly NDSP.
>
> Q. Okay. And I'm going to have to ask you to clarify because what you're saying is that - - what I'm - - so what I'm asking is what information do you have that supports your belief that the Department takes into account sex and race as a part of its hiring process?
>
> A. Oh, I don't have any information.
>
> Q. Okay. Do you know - - is there some policy that you're referring to that - -
>
> A. No.

Doc. No. 50-12, pp. 138:7 – 139:4. She readily admits she has no information or indication the Department's "real" reason for not hiring her was discrimination. This is because discrimination was not the motivating factor. A cursory review of the applicants the Department hired over Hassan shows the Department hired a racially diverse set of both male and female applicants.

[¶ 24]  Finally, the fact that the Department ultimately hired her significantly undercuts her claims in this case. As noted by the Eighth Circuit, "[W]e are mindful that '[t]here is a **strong inference** that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time.'" Arraleh v. Cnt'y of Ramsey, 461 F.3d 967, 976 (8th Cir. 2006) (emphasis added) (quoting Herr v. Airborne Freight Corp., 130 F.3d 359, 362 (8th Cir. 1997)). In Lowe v. J.B. Hunt Transp., an age discrimination case, the Eighth Circuit found it "simply incredible, in light of the weakness of plaintiff's evidence otherwise, that company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later." 963 F.2d 173, 174-75 (8th Cir. 1992).

[¶ 25]  Here, Hassan worked for the Department from 2015 until she voluntarily resigned in June of 2016, noting her tremendous enjoyment of working there. Just over one year later, the Department rehired her to work at YCC. Much like the claim in Lowe, it is "simply incredible"

that Hassan's sex and/or race/color had anything to do with the Department's decision making in not hiring her when they subsequently did hire her. See id. In reviewing the entire record in this matter, it is undisputed the Department did not use race or sex in deciding whether to re-hire Hassan for a new position. Their decision was based on either Hassan's lack of qualifications or Helgeson's observations of Hassan at the pizza restaurant. While there may be a fact question of whether Helgeson's observations were correct, this is beside the point because Hassan offers no evidence Helgeson was driven by racial or sexual animus when reporting his alleged observations. As required, pretext stands or falls on Hassan providing evidence that (1) Helgeson's reason was false and (2) discrimination was the actual reason for not being hired. See St. Mary's Honor Center, 509 U.S. at 515-16. Hassan has provided no evidence discrimination was the real reason for not being hired. Absent such evidence, the record is clear discrimination was not the real reason the Department did not hire Hassan. Accordingly, Hassan's claim for race and sex discrimination necessarily fails.

## CONCLUSION

[¶ 26]  For the reasons set forth above, the Department's Motion for Summary Judgment is **GRANTED.** The Complaint is, therefore, **DISMISSED with prejudice**.

[¶ 27]  **IT IS SO ORDERED**.

[¶ 28]  **LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED September 26, 2023.

Daniel M. Traynor, District Judge
United States District Court